Good morning, everyone. I'm so sorry that you all had to come out on this cold day. But we're in Chicago, aren't we? Yeah, that's right. So the first case of the day is 14-2506, and it's the And you must be Mr. Castor. I'm Mr. Scarborough, actually, from the Department of Justice. We chose to put the amicus curiae first in this case, I hope that's not a problem. Okay. How are you, Mr. Scarborough? Just fine. How are you doing, Your Honor? Cold. May it please the Court. This case is largely controlled by this for-profit educational corporation promised to comply with various requirements for receiving federal funds under Title IV of the Higher Education Act, including a prohibition on paying incentive compensation to student recruiters, and then knowingly violated those requirements, and thus obtained federal student aid funds to which it was not entitled. In Maine, this court reversed the dismissal of virtually identical claims against the for-profit college, explaining that a When it submits or causes others to submit Phase II claims for federal funds. Maine compels reversal of the district court's decision in this case, which rests on at least two erroneous legal premises. First, that the funding requirements at issue here, and allegedly violated, were not conditions of payment. And second, that a school is not requirements were false at the time they were made. And in addition, we believe the district court committed a third error in categorically rejecting the implied certification theory of liability that many circuits have adopted, which rests on the common sense principle that a person who knowingly bills the government for goods or services that do not satisfy a condition of payment makes a false or fraudulent claim, even if he's clever enough to avoid making any express false representations on the claim itself. Let me ask you this. Once SBC-Milwaukee has been accredited and found Title IV eligible, how is it using the promises of compliance from the PPAs each time it receives payment from the government? In other words, is there evidence the Department of Education relies on the assurances in the PPAs when it makes its funding decisions? It's quite clear that absent the PPA, a PPA that's properly entered, with all those promises made in the PPA, you can't be receiving federal funds. And I think that's the very, actually, the holding of Maine, and I'm going to quote from Maine, is that a school, quote, uses its Phase I application and the resulting certification of eligibility when it makes or causes a student to make or use a Phase II application for payment. So in other words, every time they are sending in a request for money to the Department of Education, you're on its right. They don't staple the program participation agreement back to the claim, but you're clearly relying upon all those antecedent promises, and education is relying upon the fact that, you know, when you came into the program, you represented that you were going to do all of these things. And so that's the problem here, and that's something that's recognized in a variety of different ways. One is you can relate back to, you know, the false statement, which at the time, you know, you may have had perfectly good intentions, or it may have been different people that entered into that program participation agreement at the beginning, but then you may have said, you know what, this is really hard to do all these things, and we're just going to violate this, and we're going to knowingly violate this. And so it's at the time, the relevant inquiry, as we've tried to explain in our brief, is at the time you are going in and asking the government for money. Now you're talking about participation agreement. That's when it's going, you're talking about the initial. That's the phase one part, right, when you establish your eligibility. When someone is in total good faith in everything else and signs on to the participation agreement, that's their eligibility. Well, that's the way they establish their eligibility, correct, but they, of course, the statute, I want to make clear that the representations they make go to their initial and continuing eligibility. That's quoting from 20 U.S.C. section 1094A, and it's clear in the regs and in the program participation agreement, this is sort of an ongoing thing. This is a promise that is a forward-looking thing. It's a statement about what you're going to do on a forward-looking basis. So when you're actually seeking money from the government, and this has happened, you know, there are lots and lots of requests that these schools make on an ongoing basis. They get a, you know, a Title IV-eligible student, and they tend to make these requests through electronic funds transfers that are very summary. They basically just say, we have, you know, 100 Pell-eligible students, and we want to be paid for this month. And they say, you know, and so give us this money. And so there is no express fault statement there, but education is clearly relying upon the initial representations and the fact that they are in compliance. Why don't you have another question? Well, I do. I just want to say, even on the first page, the institution agrees to comply with Title VI, Title IX, Family Educational Rights and Privacy Act, Section 504, the Rehabilitation Act, the Age Discrimination Act, and a whole lot of others. In other words, it just seems to me that they're, at the outset, they said, yeah, we're going to follow every law there is, just about. And so you're saying that violation of any one of those, not just Title IV. I think it's important to... Would that be... Yes, there's no question. There is no question that the government attaches lots of strings to this money, and the government is entitled to do that when they're paying out, you know, $150 billion, I believe, was the figure from 2013 that's paid out under these. So there's lots of strings attached. I guess Your Honor's question goes to, you know, if there's a sort of a small breach, you know, there's lots of things that they have to comply with. That goes to the question of materiality. It may go to knowledge. The courts that have addressed this issue and have been worried about sort of expansive theories of False Claims Act liability, particularly the D.C. Circuit and the SAIC decision, and the First Circuit and the Hutchison decision said, basically, yes, the government can attach lots of strings to its money, and that may seem onerous. But the way that you ensure that there is not overly expansive False Claims Act liability is by application of the knowledge requirement. They may not know that they're in violation, or it may be a nonmaterial violation. But when you're talking about, you know, the fact that there could be a nonmaterial, you know, small-scale violation doesn't exempt them, doesn't allow them to make the very big violations that are alleged in this case, systemic violations in which, you know, you are just ignoring the obligation not to pay your recruiters incentive compensation, which is a very important requirement. It was the core thing that was at issue in Maine. It's one of the core things that's at issue here. And it goes to the very essence of these programs, because when you recruit students who are poorly qualified, you know, you basically have an incentive to bring in as many heads as you can, fill as many seats as you can, because your pay depends upon bringing as many people as you can. Of course, the students vary in qualifications. They do. Some can go free because they're very poor and they have other difficulties. When they try this, and they think the government encourages those people to have an opportunity. Understood, Your Honor. That's clearly the intent of the programs. But at the same time, the government gets stuck with the tab when these students default or they don't get a proper education. And it's quite clear that, you know, the incentive compensation ban is there for a reason. And it's an important requirement here. And, you know, when you're systemically not, you're violating and knowingly violating a core requirement of a statute, a reg, and then a contract that you are forced to enter, you are committing fraud when you then go to the government and say, pay me. Even if you don't say, reiterate when you say, pay me, that, yes, I've complied with these requirements. Now, in the United States, ex romaine, we dealt with an appeal from a motion to dismiss. Yes, Your Honor. I mean, here, we have summary judgment. So what evidence is there that any of the relevant PPAs were filed with an intent to defraud? Well, Your Honor, I think that's the point here is that we don't think that the PPAs had to be, the promises in the PPAs had to be false at the time that they were made with the intent to defraud. The point, you may have had perfectly, you may have thought, okay, it may have been different people making the promises. In fact, it was different people making the promises earlier in time. But then when you get to actually, you know, getting the claims, you have people and substantial evidence in the case that people were being paid incentive compensation in violation of that core requirement. And, you know, those schools were still saying, look, pay us. You're in a rebuttal. You're in a rebuttal. I have a question. I'm happy to sit down or answer the court's questions. No, I will give you more time for your rebuttal because this is a very difficult and important case. I agree with that. This court has previously drawn a distinction between making a promise one has no intention of keeping and simply breaking a promise after the fact, right? The fact is a breach of contract, not fraud. With that in mind, how can Nelson succeed here without evidence that FBC Milwaukee intended to violate the incentive compensation ban when it initially submitted the PPAs? Do you see where I'm going? I see where you're going, and it goes to the heart of this case. The question is not sort of at the initial phase. The question is at the time you're asking for money. And just calling it a mere breach of contract, that's a term that the other side uses and defendants in these cases often use. Mere breach of contract. Just by putting it in terms of a contract violation doesn't exempt it from also being fraud. Keep in mind, the False Clean Type was enacted in 1863 to prevent exactly this sort of contract fraud. Basically, military contractors putting, you know, giving sawdust instead of gunpowder or laying mules. The key that makes it fraud is when you know, as the contractor, that you are not giving the government what it bargained for. And that's exactly the situation that we have here. And it doesn't matter that you may have intended at the beginning to do things in good faith. Once you know that you're not complying, you're committing fraud. Thank you very much, Mr. Castor. Thank you, Your Honor. Jim Castor for the later Brent Nelson. In the briefs from the defense, they call these promises forward-looking promises that are made at the time the PPA is signed. Specifically, with respect to the issue of materiality, in paragraph 22 of the PPA, the institution promises not to pay incentive compensation either directly or indirectly based upon admissions or financial aid. That's right in the contract. So that, for example, the PowerPoints, which are a part of the evidence and, in fact, a part of a motion before this panel to seal, there's a PowerPoint like the PowerPoint that my client saw, which promises the director of admissions $3,000 to $5,000 additional money in bonus if two additional students are saved. Did the director of admissions or the director of financial aid testify as to precisely what it meant to get bonus pay for exceed starts and packaging at 95% or better? Well, they provided declarations, Your Honor, that in terms of exceeding starts, they say we don't have evidence. We don't have evidence that starts equals enrollments. And I assume, and it's fair to say, that enrollments equals a start equals an enrollee who actually starts. And there is no other explanation for the bonus then. Exceed starts by 10% means he exceeds the starts from the prior year by 10%. Packaging at 95%, they say there's no real contrary evidence. They say that that doesn't mean financial aid. Or they ask this court to find that the director of admissions does not supervise people in admissions because we don't have a direct admission that he does. Can we get the names of the people who, I guess, were a false start? You know, like the name of the students that didn't succeed? The names of the people who are supposedly doing this? It sort of goes with this vague, what is the word? History or whatever, you know, because these things are happening. What concerns me here is that any for-profit business has to have certain standards. Mr. Nelson was hired. And the way out why he was hired, it seems like this is something that they're really trying to scrutinize and meet obligations. Now, Mr. Nelson obviously was disappointed or mad or angry or whatever. I assume he was fired. I don't know if he just quit. He quit in January of 2009. He said, I can't do this anymore. I can't do this anymore. And he said, you know, a couple of people, he overheard a couple of people say that they didn't have to show up to class because they just checked them off. You don't know who, you don't know what names. And I think that concerns the judge. And when this whole thing started out, it was very global. I still don't, looking at the complaint, going through it, it seems that there are a lot of these schools. Do you know how many? Well, there were several schools that were part of this number, but the evidence focused on SBC Milwaukee. I don't know how many there are within the CEC parameters entirely, Your Honor. Which is why the judge contracted it down to them. Well, we focused our energy on Milwaukee, Your Honor, and we focused our evidence. Because that's where Nelson worked. It is. And it would have been good if we had some agents and students to build in there. We had some other things that would go forward. When you say, well, here's the standard, which I can understand is, gosh, isn't this thing, you've got quotas. But what about other things when you hire somebody, you expect them to work and to get clients or students or whatever. And if they don't, you can't fire them? I mean, this is, it seems to me it has to be an internal stand on both parties. Well, in terms of names, David Kagan was the director of admissions. Carol Massey was the director of financial aid. In terms of the names of individual students, every document that was produced in this case didn't have names of students on them. The law protects the names of those students. So in terms of verifying students' names. The law protects the names of students? It does, Your Honor. Every name is excised from every document we have in the case. The law protects, I'm not an expert in that particular law, but students' names were not used in discovery. But there is testimony in the record from students whose grades or attendance records were altered? There isn't testimony from particular students. There's 12 different teachers who provided declarations or testimony that they were pressured or threatened or demoted if they didn't pass students who didn't deserve to pass. The president of the school testified that he came across a student who could not read. This was the president's testimony. Who could not read. And that student, he found out, was getting an A in the class. Beyond the question of how the student even got into the school. The attendance records. One of the teachers, most of the testimony came from teachers who came forward and provided declarations and or deposition testimony. And one of the teachers, Jaquel Gilbert, testified that about half of the student population showed up about 20% of the time. In order to have attendance that meets these accreditation standards, you have to be above 60%. And these students weren't showing up. We have direct testimony about people falsifying attendance records to meet the Title IV standards. So that Title IV monies did not have to be returned. Grades that were changed. We have testimony from teachers who said they know that they failed a student who then they saw in the next class. Who couldn't get into the next class unless they passed. We have testimony that they saw people, the registrar testified in this case, that she witnessed someone falsifying a student's signature on attendance records. Because teachers were being paid on attendance. And when people didn't show up for class, the Title IV money was supposed to go back to the government. $51 million between December of 2007 and December of 2010 went to this small school that was open for a total of eight years. We focused on three years. Were there any successful students? I'm sure there were, Your Honor. I'm sure there are examples of some students who, despite all of the rest of this stuff that was going on, were successful. But I think that the evidence in the case is that people in the workplace, the people in Milwaukee. And one of the reasons why the school closed was they falsified the placement rates for 2009 and 2010. There's really no dispute about that. 2009, they reported 79%. The placement rates were actually 48 as they corrected it after an investigation. And then for the next year, they corrected it again from 79 to 26%, well below any standard for placement. Were there students in the 26% who got a job? Well, maybe. But they counted a job placed, if somebody was in the law enforcement program where you spent $30,000 to $40,000, if you got a security job afterwards for minimum wage. That was counted as a success for the school. That's in the 26%. That's what Brent Nelson saw. Brent Nelson is exactly the person that the False Claims Act envisions bringing such a claim. He is the corporate insider, the close observer. Since this act was enacted, he is the person. evidence that his knowledge is not only direct knowledge gleaned while working at SBC Milwaukee, but also independent from allegations that have been made publicly. Well, Your Honor, that goes to the issue that relates to the subject matter jurisdiction of the court. And so if I may, we're accused of making an extraordinary concession. I'd like to read from the brief where it's alleged that we made this extraordinary concession. For purposes of this motion only, Nelson conceives that the allegations have been publicly disclosed pursuant to 31 U.S.C. 3730E4. However, to trigger the public disclosure bar of the False Claims Act, a relator's allegations must be based upon those public disclosures, citing to the Ballotsar case. In the Seventh Circuit, the phrase based upon a public disclosure means that it's substantially similar to publicly disclosed allegations, citing then the Levitsky case, which was then a very recent case from this circuit. Because the First Amendment complaint is not based upon prior public disclosures, Nelson's claims are not barred. This is the context. We are accused of causing our case by way of concession to become a shadow of its former self. This is the paragraph where that alleged concession was made. I would ask that if someone says that we waive the substantial part of our claim, that the entire context of what we said be read. I think it's only fair. In terms of what the evidence is, there is no dispute, Your Honor, that as to this time frame and this school and these people, that there was nothing in prior disclosures that related to David Kagan and Carol Massey and the implementation of this compensation plan. Nothing. So you're telling us that you are able to specify which of your allegations had not been publicly disclosed at the time you filed your complaint? Fifteen pages of this brief goes on to describe in detail why they had not been prior. Your Honor, the teachings of the Levitsky case, which was then not cited by them in this motion, was then of only a few months old, which we cited to and explained in the sentence that followed this alleged concession. The teachings are that you don't look at the allegations at 10,000 feet. You look at them at a granular level. You look at the specific allegations. It's not a question of... I'm sorry, Your Honor. Well, I think that relates to the issue of prior disclosures. I'm sorry. What I'm trying to say is, are there other schools that have been named under the same heading that have been exposed with all these things you're talking about? There are articles. They filed over 100 about charges of fraud that were made against them in different parts of the country as it relates to different campuses. And we don't really dispute that. That really doesn't have any... This particular one, which the judge did confine. He confined it to that in six months of time, Your Honor. The focus on the campus is something we did, but the judge certainly endorsed that in terms of how he narrowed the scope of what would be relevant evidence. But in terms of the timeframe, Your Honor, that relates to another alleged concession that we made. That is that we said that Prenton Nelson did not have direct and independent knowledge of things on information and belief. And as we explain in detail in our reply brief, Your Honor, what he said, and the pinpointed thing that's reviewed, is that he said he didn't have any but information and belief knowledge of the submission of the false claims. The paperwork. He wasn't involved in the submission of these IRIS forms that went to the government every time that they were seeking money after the PPA was signed. He doesn't have to have knowledge of that. He had knowledge of the fraud. And that's all that's necessary. He had knowledge of the falsified records. He witnessed the incentive compensation as he testified. He lived it. He understood these PowerPoints that were given that say if so many students go into the school, you'll make this much more money. That's a direct violation. As to knowledge, that's a direct violation of one of the specific terms. The court made reference to the fact that these laws are sometimes grouped together in a paragraph and they promise to comply with everything. Paragraph 22 sets apart the incentive compensation separately. There is no question that's material. They specifically agreed not to directly or indirectly pay people this way. And then they went ahead and did it. And bragged about it. Why do you think evidence establishing that when SBC signed the agreement, it did not intend to abide by its promise of future compliance with Title IV with the eligibility regulations is unnecessary? Well, for the same reason that the court in the motions to dismiss on plausibility, we had a Rule 12 motion. And the trial court said this, citing with approval Judge Easterbrook's language in Oakland City, the U uses its Phase I application when it makes or causes a student to make a Phase II application. It's when you're seeking the money that these promises, as they said in their brief, these are forward-looking promises. Of course they are. Of course you're reaffirming the promise when you ask for money. Thank you. I have one question. That's on this implied certification. Is that a necessary determination that we have to use that implied certification in this case? It's not essential for this case to succeed. Because it's when it's presented under A-1 or used under A-2. And the issue that ended up causing the trial court to dismiss this was the conditions of payment. The court said these were not conditions of payment. They were conditions of participation. So we succeed under A-1 or A-2. A-1 is the implied certification theory. Now, every circuit that we've seen, Your Honor, and I understand this morning, just this morning, the Fourth Circuit has approved. But the second, fourth, I have a list here of all the circuits. We couldn't find a circuit where implied certification wasn't approved. I thought it was. Well, there are some that haven't positioned themselves on this issue yet. I think those two have. We couldn't find a circuit that had rejected the theory outright, Your Honor. Anyway, that's what I wanted to say. So we'll continue on that. Yeah. All right. Thank you. Thank you very much. Mr. Loring, good morning. Good morning, Your Honor. Before you even begin, why did FPC Milwaukee close in 2013? Your Honor, there was testimony in deposition on that issue. It wasn't particularly pertinent to the issues in the case, so I'm not sure that I can recall it exactly. But I can recall generally that the company concluded around that period of time and decided to close some number of the SBC campuses as a strategic business decision because they identified certain campuses that because of the market that they were in and for other business-related reasons, they didn't think that they could be profitable going forward. I don't know that a specific explanation was given beyond that. There were other schools closed or announced to have been closed at the same time. Pardon me? Right. Oh, no. No, they were not required to be closed. It was a market-based decision. Yes. Yes, it was a market-based decision, as I understand it. I have a few prepared comments to make, but I'd like to respond to a few of the questions that the Court asked Mr. Scarborough and Mr. Kanter. Sure, any way you want to do it. Your Honor, I asked Mr. Scarborough, is there any evidence that the government relies upon the PPAs when the subsequent requests for payment are made? The answer to that question wasn't given completely. There is no evidence that the government relies upon them. There is an argument made by Mr. Scarborough, very eloquently, that the government must rely upon them. There was no testimony from the government. There was no evidence from the government. Mr. Kaster, the opposing counsel did not take any depositions or do any discovery from the Department of Education to determine whether or not they, in fact, relied upon the PPAs. Well, is there evidence in the record that when SBC signed the PPAs, that it already failed to comply with certain Title IV regulations? Because, well, is there? There is none, Your Honor. It was alleged originally, that was alleged originally, and the case survived the 12B6 9B motion because it was pleaded plausibly. Then after discovery, when we got to the summary judgment motion, we demonstrated with uncontroverted affidavits of the two people who signed the pertinent PPA agreements, with the testimony of Mr. Nelson, that he had no knowledge as to what the corporation's state of mind was when it signed the documents. Well, how could he? He wasn't there. Well, that's true. He wasn't. That's exactly right. He couldn't possibly know that, and he agreed with that. He agreed it would be impossible for him to know what they were thinking. But furthermore, I think the court, the district court relied upon the particular attempt to deny made by Relator in his response to our motion for summary judgment, which simply said we don't have sufficient information to enable us to admit or deny, and therefore we deny. And the district court found that that, under local rule, was an insufficient denial, and it therefore deemed our allegation admitted. Our allegation, our statement of undisputed fact, that there was no evidence to the contrary, that the company did intend to comply at the time it signed, and that there was no evidence to the contrary was deemed admitted by the district court. And there was no evidence to the contrary. Did the Department of Education actually conduct the yearly audits to ensure compliance with the Title IV regulations? Your Honor, the way it happens is the Department of Education requires the institution to pay, at its expense, for an outside auditing company to audit for Title IV compliance, much like a publicly traded company has the outside accounting firm audit them. And so every year the school is audited by an outside auditing firm, a detailed written report is prepared, provided to the school, and then provided to the Department of Education. And it's very significant to note, I believe, what the standard is declared to be by the Department of Education, the standard that must be met in that audit in order for eligibility to continue. And that is a standard, and this is all set forth in the record here, it is a standard of substantial compliance, not perfect compliance. The Department of Education does not say to the institution, if you break one of these rules, if you give one admissions representative, if you buy him a cup of coffee and a donut, you become ineligible. Or if you give him a gift card, or if you pay him... But we're not talking about, you know, donuts and coffee here. We're not. We're talking about millions of dollars. We're talking about millions of dollars that the school received. With respect to the incentive compensation issue, however, which I was specifically directing to there, what we're talking about is an allegation, essentially unsubstantiated, and Your Honor focused on what I think is the key point in questioning Mr. Kastor, that two employees, one time, were given a small bonus that is alleged to be improper, and the reason it's alleged to be improper is based upon the language in the bonus document, which talks about, for the Director of Admissions, starts, and for the Director of Financial Aid, packaging. Nowhere are those terms defined. The Director of Admissions did not give a deposition. He was not asked what it means. No one at the school was asked, what does that mean? The Director of Financial Aid was asked. She gave a deposition, Carol Massey, and she was asked, what does packaging mean? And she said, it doesn't mean delivering financial aid to students, so it doesn't come within the incentive compensation ban. What packaging means, as she understood it, as the Director of that department, was that she has met the deadlines of completing paperwork on time. Why do you think Nelson's claim would still fail if we explicitly allowed him to proceed under a theory of implied certification? Your Honor, if you allowed him to proceed under a theory of implied certification, his claim would still fail, primarily because he still has to demonstrate that something was violated that is a condition of payment. None of the regulations that my client is alleged to have violated, all these things about grades, keeping attendance records, even incentive compensation, none of those things are identified anywhere as being conditions of payment. This Court has held many times that a condition of payment means that it is a prerequisite to payment. And in all of those statutes and regulations, it doesn't say that any of those things are conditions of payment. In fact, if you look at Part 668 of 34 CFR, what you see is an elaborate and robust and very far-reaching enforcement scheme whereby the Department of Education, if the department believes that we have violated, that the school has violated some of these regulations, they have an elaborate process that they can follow. They give notice. They have a hearing. And then if they find that you've violated those things, they have an escalating series of penalties that they can impose.  What's the penalty for noncompliance? The penalty for noncompliance is, as I was just describing, Your Honor, it doesn't have to be a condition of payment for the department to pursue proceedings under Part 668. If they find that you violated anything at all, they can issue a letter to you. They can notice up a hearing. They can call you in there to explain what you've done. And they can impose an escalating series of penalties on you all the way up to a discretionary right to expel you from the program. But it doesn't happen automatically, as the relator sought to have it happen in this case, just because you violate a few regulations. Your Honor, I don't know that each one is. I am certain that at least one or more are, and that the process... This is supposed to be an annual report. It is an annual report, yes. It is. And so each time I assume that independent evaluation, I guess it's sent to the Department of Education or somebody. It is sent to the Department of Education, yes. The reason I ask is part of it. I'd just be curious if this independent audit threw up some red flags, said something about a problem or alerted them or something. You seem not to know. Your Honor, what I do know is this. I know that each of the years in question, the report of the independent audit found that the school was in substantial compliance with Title IV regulations. I will say this. I've represented enough Title IV institutions to be confident. To be what? To be confident, almost to the point of certainty, that there were some violations, because Title IV is so detailed and far-reaching that I suspect there's not a school in the country that doesn't, at some point in time, violate one or two of those regulations. Well, we have a big problem with student loans, et cetera, in the country right now. I assume this is part of the accumulation of debt. I don't know. It seems to me that when the money is spent for the government, it's money spent. It's not money borrowed. I understand the funding here is not a loan. Is that correct? This is not a student loan. Students don't borrow money to go to these schools? No, some of it is loans and some of it is not. There's two primary courses. Does it come under this? Yes. Some of it is what's called Pell Grants, which is money you don't have to pay back, and some of it is federally guaranteed student loans. Or in the last two or three years, they're direct student loans. But back then, at the time of this case, they were either direct loans or they were loans from outside lenders that the government guaranteed. So, yes, some of it's loan money, some of it's grant money that's given directly. We have a lot of that going on. So I thought it was sort of curious. And I guess you think that at least one of them is in the record, one of these reports. I'm curious what that report says and does. You say it only requires to show substantial compliance. But this parade of horribles that we have, you know, been treated to, how could anyone imagine that any audit that said it's in substantial compliance would be correct? Your Honor, we have a pretty long section in our brief addressing the factual issues, and we move for summary judgment on those grounds. Mr. Castor painted a parade of horribles to you, and with all due respect to him, and I'm not suggesting that there were disputed facts. I believe there were no genuine issues of material fact, even on the things that Mr. Castor has presented to this Court. So the parade of horribles is, in fact, a very short parade, and it's not nearly as horrible as it sounds. Now, I wouldn't suggest that you need to comb through the record to figure that out, but let me give you a few examples. Well, I think we're going to have to. Well, I don't think you have to. And let me give you one really good reason why you don't have to. Well, we always look at the record. Well, I know you do. I didn't mean to suggest that, but I meant to comb through all of the 645 statements of material undisputed fact and figure out who said what about what. Here's what overrides all of that. Even if all of that is true, even if all of that is true, there still has to be a false claim that is directly connected to some violation of Title IV. The Court said in the very recent Grenadier opinion that the PPA doesn't become false after the fact. So that's not a basis for establishing that the claims are false. This Court said in Absher just four months ago that it would be absurd to say that because there were some violations that the institution there, a nursing home, becomes completely ineligible. So they don't have either of those theories available to them to say that we were ineligible and the claims were false. So what they have to do is they have to show that a particular claim for reimbursement on behalf of a particular student was false because that student had his grades improperly changed or his attendance records improperly changed. And what the briefing before this Court will show very clearly and very simply is not only is there no evidence of that, there's not any evidence connecting student John Smith to a claim for reimbursement on his behalf. Now they just said that you can't – everybody's name is confidential, which is curious. Nevertheless, if you can't name anybody, then it would be hard to say John Smith was paid for his – he didn't get paid. He gets paid for school under false pretense. Here's how that happened. He said that was not his area. Mr. Benson, it was not knowledge about who gets paid and who doesn't get paid. He's just talking about the individual things that he apparently observed. Let me tell you how that happened, Your Honor. They made extremely broad discovery requests to us, which sought, among many other things, specific student identification and information. We objected to that based upon the Family Educational Rights and Privacy Act, known as FERPA, which says that we can't disclose student educational records, which may indeed include things as elementary as their name and address. We cannot disclose that without either the consent of the student or an order of the court. We went through a long and drawn-out meet-and-confer process. They had the right to seek a court order to compel us to produce all kinds of information about those redacted student names. They did not do that. At the end of the meet-and-confer process, we reached an agreement with them, and by the consent of the parties, the discovery, the documents produced, and the information produced did not include student names. That was the agreement that was reached, and they could have asked Judge Stanton Mueller to order otherwise, and they did not do so. Even putting all that aside... There were students that came forward and said they loved education. I beg your pardon? The students that didn't pass or didn't graduate or whatever, they failed for maybe a good reason. They didn't come forward. There's nobody that came forward individually or participated in this or whatever. There was zero testimony from any student at the school, absolutely none. He says there's some testimony from teachers. There is some testimony from teachers. A great deal of it, Your Honor, that was referred to by counsel is double, triple, quadruple hearsay, and it is things like, I believe or I felt. It is speculative stuff. All of that is addressed in the papers before the court and in the summer judgment papers below. It was a fairly exhaustive process to go through all that, but at the end of the day, they still have to prove that some violation caused my client to be ineligible to receive payment. The district court didn't allow a second amended complaint. That's correct. Was there some discussion, I don't know what the agreement is, but is there some question that in the second amended complaint they would be able to come up with this stuff? Because what you just said is what the district court said. Yes. The second amended complaint did not address those kinds of issues at all. The second amended complaint, the changes in the second amended complaint, addressed only. Was that submitted? It was submitted with the motion for leave to amend. It was not allowed to be filed. Is that somewhere in the file? I'm assuming that Relator would have put that in the record since they're asking for reversal on that grant. I don't recall specifically, but it did not address. It did not address any of these issues about individual students. It addressed only the potential additional claims against CEC, which they were trying to bring back into the case. The condition of payment issue is significant, because that's what the district judge said. It was a condition of, I guess, eligibility when you signed the PTA? There's sort of this three-part dichotomy. I guess that's a trichotomy, but there's these three conditions of eligibility, participation, and condition. The cases, if you look at them all, get a little bit muddled as to exactly what is what. What is clear, and what has been made very clear in this circuit, is that there's something called a condition of payment, and that unless you violated that, you have not made a legally false claim to the government, and that for it to be a condition of payment, it has to be a prerequisite to payment, and nothing that we're alleged to have done is said to be a prerequisite of payment. The grading issues, the attendance issues, none of those are prerequisites to payment. They are things which if the government comes and looks at them and finds that they don't like what we've done, they can impose penalties upon us. But nowhere does it say, if you have poor attendance records or if you give somebody a grade they don't deserve, you don't get paid. I want to go back for a minute. How would you have been prejudiced by reinstating CBC as the defendant? The discovery had not yet closed, had it? Yes, it had, Your Honor. Discovery had closed, yes. I believe discovery closed either the same day or a week or so before. It closed either on the same day or shortly before. Discovery was closed. That was also the summary judgment deadline, and that's the principal way in which we were prejudiced by the motion for leave to amend is that had the amendment been granted, my client, CEC, which had already been dismissed, would have been denied the opportunity to move for summary judgment under the scheduling order in place. For some reason, I just don't know. I thought there was something about a subsequent deposition after the closing of discovery. That may just be wrong. Maybe think about another case. Your Honor, I may be wrong, and if I am, I apologize. I think there was expert deposition that followed that, but I'm as sure as I can be that that discovery was closed. I don't know. Yeah, the expert depositions definitely took place because I remember being out of town with Mr. Castor in March at those depositions, but the fact depositions I believe were closed by then. If I'm wrong, counsel will correct me. The district judge is pretty adamant that this is over, you know, that we've been doing this for a long time. We've had this long section of the First Amendment. So I'm just trying to figure out what it is. But Nelson sought, if I remember correctly, Nelson sought leave to amend his complaint about six weeks after the district court first dismissed CEC, but it was still within the allowable window for seeking leave to amend. But Judge Stabenmueller did, I think, add that letting CEC back at that point would disturb the summary judgment schedule, but I did think the discovery was still open, so I don't know. I'm not sure there. I am not sure either. That fact has escaped my mind at this moment. But you are correct. The dismissal of CEC occurred in, I believe, the second half of November, and Nelson waited six weeks until the very last day in which he didn't have, the schedule didn't say you may amend your pleadings by January 3rd. It said you may file a motion for leave to amend by January 3rd, and that's what he did. So he didn't have an absolute right under the scheduling order to amend. He simply had the right to file a motion. He filed that motion on the very last day and thereby deprived CEC of the right to conduct any discovery that it might want to conduct because discovery, fact discovery, again, I am reasonably certain was closed. More importantly, fact discovery had to be closed because the summary judgment deadline was January 3rd. We wouldn't have been conducting fact discovery after filing summary judgment motions, I don't think. So my logic tells me that I believe it must have been. Even if discovery was still ongoing, we had to file our summary judgment motion on behalf of any defendant, including CEC if they became one again, by January 3rd, which we were deprived of the right to do if they were allowed to be amended back into the case after January 3rd. And the court had set the case for trial in April, a trial date that was set in stone, and that the trial court had no inclination or desire to continue. And I might add my client didn't want the trial date postponed either. My client did not want this sort of damocles hanging over their head any longer than was absolutely necessary. And we were delighted to have an early trial setting. And unless the case was disposed by summary judgment, which it was, we were planning on being ready to try the case in April and we didn't want that delayed simply because Mr. Nelson chose to wait until the very last day to seek leave to amend. And I might add the motion to dismiss CEC on 9b had been pending for two or three months  So if he really felt he needed to amend, he could have done it before the court ordered it. Now he obviously didn't want to because he didn't want to agree that our motion was well taken. But he did so. If I may address briefly the subject matter jurisdiction issues which the court brought up with Mr. Castor, I think his concession that he made in his brief below was very clear. And I don't think it was... While for a moment or two when I saw it, when it was originally filed, I was a bit surprised. But the more I thought about it, I wasn't. Because we had demonstrated very clearly in the record that there was massive public disclosure of these allegations. The public disclosures included such things as saying that these types of violations are occurring at all CEC schools, all Sanford Brown campuses everywhere in the country. So Milwaukee was included with those kinds of things. In fact, among the public disclosures were articles. It's very interesting if you really dig into it. Mr. Nelson produced some emails that he sent to friends of his, sending them copies of articles from a magazine about some other school. I don't even remember the name of it. Saying, read this article. This is exactly what I saw at Sanford Brown. So we've got things being disclosed all over the place that are just like what he says he saw. What do you mean referring to other schools? Other schools associated with the school? No, other unrelated schools. So his admission is that for purposes of this motion only, Nelson concedes that his allegations, and that can only mean all of his allegations, his allegations have been publicly disclosed. Now the case law says, unmistakably, that a complaint is based upon public disclosures if the allegations in the complaint are substantially similar to allegations already in the public domain. Well, if all of his allegations are in the public domain and have been publicly disclosed, then it's ludicrous to suggest that the allegations in the complaint are not substantially similar to those things that have been publicly disclosed. It's a general allegation, general exposure, because there's a lot of discussion about, I don't care where it is, about student loans that are borrowed and to get a degree that's worth it. Some of that is going on in general terms, about whether a student should even be able to get a student loan to take certain types of courses. And that's why colleges cost so much. So I'd rather it be a focus, it would have to be at least in this company, maybe a lot of the other affiliates. And of the 100 or more disclosures that we identified, the vast majority of them related to this company and its schools. And many of those said, these are things that are happening at every Sanford Brown campus. And some of those disclosures specifically mentioned Milwaukee. So when I saw that the relator had admitted those things, my conclusion after thinking about it was that was a smart move. He admitted it was a strategic decision, he admitted those things which he saw, we had beaten him on, and he decided to put all of his chips, as it were, on the original source argument. And I didn't think it was an unwise or poor decision in any way. I'm sorry, original source? Original source, which is the second prong of the jurisdictional point. Yeah. So in summary, there are four principal reasons this court should and I think must affirm the summary judgment. And all of those reasons come from the opinions of this court within just the last four months, the Grenadier v. Ukrainian Village Pharmacy case and Absher v. Moments Meadows. First of all, an FCA claim based on an allegedly false statement must fail unless the statement is proven to be false when made. You questioned Mr. Scarborough about that at length. It's clear that the law says that. The PPA doesn't become false after the fact. As Judge Posner noted in the Grenadier case just a month ago, if they change their mind even for purposes of greed, that doesn't make the original statement false. They may have breached their contract, but it doesn't mean the original statement was false. Secondly, there's no false claim if the underlying law or contract alleged to be violated is not a condition of payment. These clearly are not conditions of payment. Thirdly, the False Claims Act case must fail unless they can tie a specific violation to a specific claim that was subsequently made. Not only did they not do that here, they didn't even try to do that here. And fourth and finally, the Relators theory, which the government apparently doesn't endorse. They haven't spoken to it. I wish they had. I'd like to know their position. But their theory that by violating a few or a number or some number of Title IV regulations, you become automatically ineligible to ever receive another Title IV dollar, as Your Honor said in the Ebsher opinion, that is absurd. And you have 1,700 violations alleged there. And you said that doesn't make them automatically ineligible for everything. They still have to say which patient tied through to which claim and prove that there was a connection between them. They haven't done that here. For those four reasons, we ask that you affirm the summary judgment. I see that my red light is on. I'm out of time. Thank you very much. Yes, thank you, Your Honor. Mr. Scarborough, please. Three quick points, and I realize my time here is very limited. The United States is here because of the legal errors in the district court's analysis under the False Claims Act that have spillover effects to other cases, not just in this case. The first is this issue of whether something, a statement has to be false when made in order to be something that, you know, is actionable under the False Claims Act. The statute, the provision for express false statement liability, Section 3729A1B, specifically speaks to this. It talks about making or using a false statement, material to a false or fraudulent claim. To hold that it's only that you look at it at the time it is made reads the use clause out of the statute. This is important to the government, not just in this case, but in many, many other situations in which companies make initial representations about their eligibility. For instance, in the Section 8A program where you say, I'm a small business, and you can only get government funds or government contracts because you are a small business. Well, that may be true at the time, but if that changes, you have a duty to update that information. You can't just keep on getting the government money. That's exactly the same situation here. A case that addresses that issue in the Fifth Circuit that's cited in our brief is the Longhi case, L-O-N-G-H-I. That's part of the reason why we are so concerned with the district court's erroneous ruling about this. It has to be false when made. You know, the statement, its continuing validity obviously travels, continues on, and is continuing to be relevant in these programs. That leads to my second point, which is there's been some discussion about whether there is evidence about whether the government relies on the statements initially made in the program participation agreements. There doesn't have to be evidence. Materiality is a legal question. This court made that very clear in the United States v. Rogin case and rejected specifically the argument that is being made here that you needed to put on testimony from someone at the government agency that they wouldn't have paid. This court said in Rogin, no, you don't need testimony. You look at the scheme. You look at whether it could naturally have influenced the government's payment decision. That is the materiality standard this court has endorsed that is now codified in the statute itself. The third point, I think close to the last, is this issue about whether these requirements are conditions of payment. The statute makes very clear that they are both conditions of participation and conditions of payment. You can't be in the program, you can't get any money unless you comply with these requirements. And it is further clear that education can withhold funds. 10 U.S.C. section 1094C1G makes clear that they can withhold funds if you violate these things. That was clearly the premise, although unstated in this court's prior decision in Maine that these were conditions of payment. It is the explicit premise and the explicit holding of the Ninth Circuit's decision in Hendow in this exact context. I do have a question. Yes. Would you comment on Grenadier? I think Grenadier was a case in which there were lots of problems with the claims there. I think there's an underlying view that there wasn't really a predicate violation of the anti-kickback statute. That is actually a holding in that case. That would have been sufficient to dispose of that case because if there's no predicate violation, of course, you don't need to say any of this stuff. I hesitate to characterize what Judge Posner says about the faults were made as dicta because it is in there. It actually precedes the analysis of the anti-kickback violation. However, there is no attempt to harmonize that with the language of the statute, which I just quoted to Your Honor, that talks about making or using a false statement material to a false claim. So you don't think we'd have to overrule our opinion of three or four weeks ago in Grenadier? I think that the more specific and controlling opinion here is the Maine decision. Again, to say that if you had innocent intent at the beginning but then you concocted your fraudulent scheme and you decided to keep on asking the government for money and you're clearly relying upon those initial representations that got you in the program at the beginning, that cannot be the law. It would gut the False Claims Act. That's why we're here. That is the principal reason we are concerned about this case. One final point. I realize I'm drastically over time. Counsel alluded to a decision in the Fourth Circuit that came down this morning. It was a case I argued its name, and we will submit a 28-J letter. Yes, please. Yes, we will, but I just wanted to give the court the update. It's called U.S. X. Rel. Batter. Batter is B-A-D-R, and it's in the Fourth Circuit. It came down today, this morning, and it expressly joins the many other circuits that have adopted the implied certification theory. And again, that theory, it's unfortunately termed because really it doesn't talk about certifications at all. It just rests on the common sense idea that if you are violating something that the government cares about, that is a requirement in order to be paid, it doesn't matter whether you actually say something about that when you go to the government. If you know you are violating it, and you go to the government and you say, pay me, you are implicitly representing that you have complied with those requirements, and that's why we think that fits this case to a T. Your Honor asked about whether the court needs to get to implied certification. I don't think you need to get to it. If you agree with us that the expressed false statement of the PPA is sufficient for liability under Section 3729A1B. However, if you disagree with us, I do think the implied certification theory has to be addressed and is fully in play. And of course, you could rule on both theories. That's discretionary. You're saying you think there has to be a violation at the outset that avoids implied certification. Is that what you just said? No. I think what I'm trying to say is that there's two different provisions of the False Claims Act at issue here, and the implied certification theory flows from 3729A1, which does not require an expressed false statement, but we have an expressed false statement here. We have the expressed false statement in the program participation agreements, which clearly was used throughout to get payment. And that in itself is sufficient for liability. However, if you think it's not for some reason, that it has to be false at the time it was made, contrary to the express language of the statute, then you do need to address the implied certification theory because you still do have claims being made, and they implicitly are representing, in our view, compliance with all applicable Title IV funding restrictions. I just want to know what the expressed false statement is. Again, it's... At the start. At the start. It's the statement in the program participation agreement that you agree to comply with these things, and one of the very important things is the incentive compensation here. Whether or not you had intent... That's correct, Your Honor, but that's not... I mean, again, the ship has sort of sailed on that in the main decision. I mean, the same arguments were made by defense counsel there. There's lots and lots of laws we have to comply with. That's often the case. The government is disbursing billions of dollars under these programs. Yes, we require compliance. If there is innocent noncompliance, if it's, in the words of Judge Easterbrook from Maine, tripping up on a regulatory complexity, that's not going to have the requisite knowledge. It's not going to be material. You're not going to result in liability. It doesn't mean you can just ignore gross noncompliance. All right. Thank you very much. Thank you, Your Honor. OK. Mr. Kessler. Your Honor, I would like to address the last point, the question about the two different provisions that are at work here is a presentment claim, which relates to the implied certification, and the use claim, the idea that you use the record, the PPA, which is false at the time of its use when you seek the payments for students as they are in school. The money then goes to the school. It's dispersed to the student periodically, even for such things as living expenses. But that disbursement and that seeking that money long after the PPA was signed is the use of the PPA, which at the time of its use is a false record under that provision of the False Claims Act. And that's why you don't have to reach implied certification under that theory. But there's two different theories. There's the presentment that you're presenting this form to the government, and there is no precise false statement in the form. And that is the argument being made there under implied certification is that you're certifying these earlier promises that you made at the time that you presented, even though the form itself doesn't contain those promises. Correct, correct. That's the time you seek the payment. Right, right, right. So that's why I think under the use, the separate provision for use, when the PPA is used, that you don't have to reach it under that theory. Anyway, I have a few points I want to make here in my rebuttal. There was reference made to the Apsher case, recent decision of the court. It's important in terms of the myriad of regulations that might be at work in these kinds of circumstances, and there are many. But in terms of that, in the Medicare context, the court has expressed concern that a False Claims Act case in a Medicare context might essentially violate federalism concerns. That is that you're essentially supplanting what might be a medical malpractice case for the individuals in the nursing home by allowing these somewhat, the myriad of regulations to become something that is the basis for a false claim. So we don't have any of that here. There has been a significant difference in terms of how this court and other courts across the country have dealt with issues when they have dealt with incentive compensation violations. And they may say, they may offer a declaration or a testimony from Carol Massey that says, well, packaging doesn't equal financial aid. Well, it equals, according to her, the putting of the documents together, which is essentially financial aid. Or that there's no evidence on this at all, but starts does not equal enrollments or admissions. That's what they say. Or we don't have evidence. We don't have to define every word in the English language, especially when we have a corporate document that's says, if two more students are in the school, the director of admissions is going to get $3,000 to $5,000 of additional bonus. That's what the PowerPoint says. That's the corporate document. That's the admission. That clearly shows a violation of paragraph 22 of the PPA. The issue, their question about the closure of the school. The school is closed. The school went on probation in May of 2012 immediately following its false placement rates from 2009 and 2010. ACICS, which is the private entity that actually audits these things on an annual basis, a group of volunteers funded by schools like this, raised questions beginning in 2011 regarding placement rates. Those placement rates were false for 2009 and 2010. One of the promises in the PPA is that advertised placement rates be truthful. That's separately set out in the PPA, because that's important to all the students, to everybody who goes there. In terms of... Are these audits in the record? There are some of them that are in the record, Your Honor. Certainly the trail of events that starts in June of 2011 leads to the closure of the school. I think there are documents back and forth from ACICS. Certainly those are part of the record, I think. What is that, ACICS? ACICS was the private agency that did the audits. It's made up of volunteers who do these audits. And with respect to CEC being in the case or not, how this happened so we can clarify. CEC was dismissed on motions to dismiss on lack of plausibility because, according to the district court, we had not shown that CEC had signed the PPA. There was nothing in the record. I didn't think a motion to dismiss would measure the evidence in the record. But what we did was, of course, we met and conferred with the other side. In the 42 days that elapsed between the time that they were dismissed and the time that we sought to add them in, we had to take a corporate deposition, get CEC to admit they signed the PPA, which we thought was axiomatic, meet and confer, ask for their agreement. And by the day that they agreed that we could move to amend to add parties, the district court didn't set down the schedule we ordered. Parties did. We agreed to this date. This was the date they agreed to. And they objected on saying that they were prejudiced by the date that they agreed to. And we were denied the right then to... I'm going to have to... Yeah, I understand, Your Honor. Let me just close this. There's a lot of issues in the briefing talking about a parade of horribles. If one different, small, immaterial regulation could give rise to a false claim, that's not what we're talking about here. That's not what we're talking about. We're not talking about anything like that. I would raise this parade of horribles. What if this kind of use of government monies, of our monies, goes unremitied? Thank you. Thank you all for a very well-argued case. And it will, of course, be taken under advisement.